# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2009-CA-00561-SCT

*REBELWOOD APARTMENTS RP, LP,*
*REBELWOOD APARTMENTS TC, L.P.,*
*INTERSTATE REALTY MANAGEMENT*
*COMPANY, ARIES PROTECTION AGENCY AND*
*STEPHAN MILTON STAFFORD*

*v.*

*DWIGHT ENGLISH, GUARDIAN OF DEONTE*
*DEON ENGLISH, DWIGHT ENGLISH ON*
*BEHALF OF DEONTE DEON ENGLISH,*
*INDIVIDUALLY AND ON BEHALF OF ALL*
*WRONGFUL DEATH BENEFICIARIES OF*
*CRYSTAL COLEMAN, DECEASED*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/30/2009 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | DONNA BROWN JACOBS |
| | JOSHUA J. WIENER |
| | ANDREW N. ALEXANDER, III |
| ATTORNEYS FOR APPELLEES: | JAMES ASHLEY OGDEN |
| | JAMES W. SMITH, JR. |
| | PRECIOUS TYRONE MARTIN |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | REVERSED AND REMANDED -09/23/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE CARLSON, P.J., RANDOLPH AND CHANDLER, JJ.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1. The premises-liability case before the Court today is an appeal from a substantial verdict in favor of the wrongful-death beneficiaries of Crystal Coleman. It was brought by Dwight English, the father of the youngest child of Crystal, charging that the managers and owners of Rebelwood Apartments ("Rebelwood"), an apartment complex in South Jackson, failed to provide adequate security. The suit was filed in January 2008 and tried in January 2009.

¶2. Crystal's body was found in the front passenger seat of her car, parked at Rebelwood, by her father, Larry Coleman, who resided with Crystal and her three minor children. When Larry discovered her body, he called the Jackson Police Department ("JPD"), which responded and began an investigation. The investigating officers found no signs of trauma or injury, but, in accordance with their protocol, transferred the body to the Mississippi State Crime Laboratory. During the autopsy, it was discovered the cause of her death was a gunshot wound. JPD reclassified their investigation as a homicide. Leads developed in the investigation led to an admission by Cleveland Ellis, III, an acquaintance of Crystal, that he had shot Crystal at Woodbine Terrace, where he resided, and that he had returned Crystal in her car to Rebelwood. JPD obtained evidence from Ellis's mother, uncle, and cousin, as well as physical evidence that corroborated his story. JPD obtained additional facts from Crystal's family, former boyfriend Dwight English, and her friends and neighbors.

¶3. In December 2008, after Ellis's criminal trial had been postponed, Rebelwood moved for a continuance until after completion of the criminal trial, so that Ellis would be able to testify without incriminating himself. English stated in his response to the motion for

continuance that he would stipulate that Ellis would claim that the shooting had occurred elsewhere.

¶4. English moved pretrial to exclude the "policy [sic] report," as it contained hearsay. English argued the lack of any hearsay exception and that the potential for prejudice outweighed the probative value of the evidence, citing Mississippi Rules of Evidence 403, 803, and 804. Rebelwood argued that, as the police report was a report of a public office or agency, Mississippi Rule of Evidence 803(8) provided an exception to admit it, or at least portions thereof, at a civil trial. Rebelwood argued further that, since Ellis's statements were against his interest, the report "carrie[d] an extraordinarily high degree of trustworthiness," thus, "other exceptions" would allow it, citing Mississippi Rules of Evidence 803(24) and 804.

¶5. Rebelwood further argued that JPD detectives should be allowed to testify as to what they had learned in the investigation about where the shooting had occurred. The court ruled that, despite the earlier stipulation, English need not stipulate that Ellis would claim the shooting happened elsewhere, after English withdrew the stipulation offered in the pleadings, based on the decision of the trial judge to exclude the police report.

¶6. English presented numerous witnesses, including combined fact/expert witnesses. Testimony from some of these witnesses varied significantly from the witnesses' statements to JPD officers during the investigation and conflicted with their deposition testimony. In a nutshell, material issues of fact existed for jury resolution, including the time and place of the shooting, the presence *vel non* of adequate security, notice to the apartment owner and managers, and the relationship *vel non* of the assailant and victim, *inter alia*.

3

¶7.    At the conclusion of a four-day trial, a jury returned a $3,000,000 verdict against Rebelwood. Rebelwood filed this appeal and asked the Court to consider numerous issues, not all of which require consideration for resolution, as we find that the defendant was denied a fundamentally fair trial. We reverse and remand for a new trial.

## FACTS AND PROCEDURAL HISTORY

¶8.    JPD was called to Rebelwood at approximately 5:31 a.m. on Thursday, January 11, 2007. Two detectives, Tyree Jones and James Roberts, were assigned to investigate. Upon arrival, the officers found Crystal's body in the front passenger seat of her parked car. The keys were in the ignition. Crystal's father, Larry, made the initial contact with JPD. He discovered Crystal after he woke up and saw that she was not in her room. He told JPD that he had last seen her alive on January 10, 2007, at approximately 9:30 p.m. The detectives initially were unable to determine with whom Crystal was last seen. No determination was made that morning of how Crystal had died or if she had sustained any obvious injuries. She was transported to the State Crime Laboratory for an autopsy. Evidence found in or near the car included an empty Bud Light bottle containing a silver gum wrapper with gum. The detectives then departed the scene. Later that day, Jones learned that, during the autopsy, the examiner had found that Crystal had been shot once in her left arm and upper torso. Jones proceeded to the autopsy and found that the jacket the victim had been wearing had hidden her injuries and blood. A spent projectile also was found in the jacket. Other than the gunshot wounds, Crystal displayed no wounds or injuries and did not appear to have been in a fight or struggle. Jones concluded that the deceased had been shot while a passenger in the seat of the vehicle, possibly by someone at or near the driver's seat. In processing the

4

vehicle, the police found an empty shell casing. The crime-scene investigator also found a Bud Light top in the vehicle. Returning to Rebelwood, the detectives interviewed Crystal's family, advising her father that the investigation had been upgraded to a homicide investigation.

¶9. That same day, Detective Tonia Williams-Hayne received a call from her hairdresser, who requested that Williams-Hayne come to her beauty shop. Upon the detective's arrival, Veda Ellis, mother of Cleveland Ellis III, disclosed that her son had related to her and other family members at 2:00 that morning that he had shot his girlfriend. He had described it as an accident and had said that, in panic, he had left the scene. Veda had convinced her son to cooperate by turning himself in to JPD and telling the truth.

¶10. On January 12, 2007, at approximately 10:00 a.m., Williams-Hayne told Jones of this development. Shortly thereafter, Ellis presented himself to police headquarters, accompanied by his mother and uncle, Willie Brown. Ellis was afforded his *Miranda* rights, but elected to waive those rights and give a statement. *See Miranda v. Arizona*, 384 U.S. 436, 444-45, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966). Officers in attendance were Jones, Roberts, and Detective Ford Hayman. Ellis confessed to the officers that he shot Crystal while they were in the parking lot of his apartment complex at "3100 Woodvine [sic] Terrace." He said he panicked and drove her back to her apartment complex, Rebelwood (located at 200 Rebelwood Drive), around 9:00 to 10:00 p.m. on January 10, 2007, and left her in the vehicle. Ellis stated that the victim was not his girlfriend; that they had had sex on several occasions, but that she was just a good friend. They were alone, and no one witnessed the incident. JPD also learned that Ellis confessed that night to his uncle, Willie Brown, and

sought his assistance, but that Brown refused. Ellis related that he and Crystal had not argued preceding the incident, nor had she assaulted him, or vice versa. He provided an accurate description of what the victim had been wearing, what had been in the vehicle, and what they had been doing prior to the incident, which was corroborated by physical evidence acquired during the investigation.

¶11.    Roberts's narrative report and testimony reveal that on January 11, 2007, at 6:15 a.m., he received information from Larry that he had last seen his daughter around 10:30 to 11:00 p.m. the night before. According to Larry, Crystal had said she was going out for a while and would be back later. Roberts concluded there was no sign of a struggle inside the vehicle. When he prepared his initial narrative report, the cause of death had not been determined, awaiting autopsy.

¶12.    On January 12, 2007, Hayman prepared a narrative report, memorializing that Ellis had been accorded his *Miranda* rights and had been interviewed concerning the shooting of Crystal. Hayman's narrative report confirmed that Ellis related to the officers that he was playing with the gun, that it went off, and that a bullet struck Crystal. Ellis then drove Crystal's car to Rebelwood and parked the car in the parking lot. Next, Ellis went to Brown's residence and told him what had happened. Hayman corroborated Ellis's statement by interviewing Brown. Brown related that Ellis had come to him between the hours of 9:30 p.m. and 10:30 p.m. on the evening of January 10, 2007, and had advised Brown that he had made a mistake and had shot Crystal.

6

¶13. Also on January 12, Jones prepared a sworn affidavit to present to a municipal court judge to obtain a bench warrant for Ellis's arrest. The sworn affidavit was titled "Underlying Facts and Circumstances, Murder, 97-3-19, 2007-6750."

¶14. The "Underlying Facts and Circumstances," prepared as a result of JPD's official investigation, reads that Crystal was often seen with or associated with Ellis; that on January 12, 2007, at approximately 10:00 a.m., detectives were advised that Ellis was a suspect and was going to turn himself in. Ellis said during an interview that he had shot Crystal by mistake as he was getting out of her vehicle on the night of January 10, 2007, at his residence, 3100 Woodbine Terrace. After he shot her, he drove back to 200 Rebelwood Drive and parked the car in the parking lot where he left her. He immediately told his uncle, Brown, what had happened and attempted to get him to dispose of the weapon, which Brown refused.

¶15. In addition to Brown, Mario Hawkins, Ellis's cousin (who did help dispose of the weapon), was interviewed on January 12, 2007. He likewise corroborated the statement provided by Ellis, and later led officers to the weapon.

¶16. On January 23, 2007, at approximately 3:20 p.m., Jones spoke with Dwight English, the plaintiff in this case and Crystal's former boyfriend. English offered that he did not have any pertinent information in regard to the investigation. He said he knew of the suspect, Ellis, and that Crystal previously had told him they were good friends. He further stated he knew of no altercation between the two of them, nor had he heard of any. He stated that he had never had an altercation with Ellis, but he had seen him at Rebelwood on several

7

occasions. He stated one of Crystal's friends, Tyra James, had mentioned to someone that Ellis had been seen playing with the gun sometime before the murder.

¶17. English testified at trial that Crystal and Ellis were friends and that Ellis wanted to be her boyfriend. He further testified that Ellis had reportedly fought with girlfriends at Rebelwood and that apartment management had done nothing to prevent Ellis from visiting the complex. English further testified that Crystal had told him Ellis had harassed her and at one time had grabbed her. A former security guard at Rebelwood testified that she had seen Ellis fighting with a girl and had reported the problem to a former manager.

¶18. On January 26, 2007, Jones spoke with James via telephone. She stated that she and Crystal had been friends since they were seven years old. She identified the suspect by his nickname, "Boobie." She had seen him with the gun on two occasions, once in Crystal's car and once at his mother's apartment. She stated that she and Crystal had worked together. She also stated that Crystal and Boobie "had met at Rebelwood Apartments and they were involved in a relationship and she liked him a lot." She stated she had never known him to be violent towards her, nor had she ever seen him threaten Crystal.

¶19. Later that day, James gave an additional statement. It was typed, and she signed both pages, initialing specific questions, including:

Q:     Was he and Crystal involved in a relationship?

A:     Yes. (*T.J.*)

Q:     Did she like him a lot?

A:     Yes, a whole lot. (*T.J.*)

Q:     Do you know how long they had been involved?

8

A:      About 6 or 7 months. (*T.J.*)

Q:      Do you know of him ever being violent towards her?

A:      No. (*T.J.*)

At trial, James said she had no memory of what she told the police, and contrastingly testified that Crystal had been trying to get away from Ellis and that Crystal had said that she and Ellis had been arguing. James's signed statement previously had been excluded from evidence, as part of the police report.

¶20.    Larry, the decedent's father, did not testify at trial. Although he testified in a deposition, the transcript was not introduced at trial. Portions of his deposition were used in the examination of other witnesses, establishing that he had testified under oath that Crystal and Ellis had been friends. Larry said that Ellis had grabbed Crystal about two months before she was killed, and that he had reported this incident to apartment management. Nonetheless, he repeatedly swore that he had not been worried about Crystal being with Ellis.

¶21.    Karmesha Jones testified that, although she was not a tenant at Rebelwood, she lived there with a friend and that she had been a "sexual friend" of Ellis. She testified that Ellis had pulled a gun on her and that she had reported the gun incident to a former Rebelwood manager.

¶22.    Evidence adduced at trial was that Rebelwood is a 160-unit federally subsidized apartment complex in South Jackson near Terry Road. Crime has been a problem at that apartment complex and the surrounding neighborhood for an extended period of time. Police

9

records were admitted, over objection, showing the numbers of police service calls to Rebelwood over a ten-year period, and also for a one-year period prior to the crime.

¶23. A manager of the security firm, Aries Protection Agency, a codefendant that had been dismissed, testified that the agency provided security (two uniformed, badged, armed guards) for Rebelwood Apartment complex from 5:30 p.m. to 11:30 p.m., Tuesdays through Saturdays. He testified that he told a former apartment manager that the crime problem continued after midnight and asked the manager to increase security to twenty-four hours, but was turned down.

¶24. One of the plaintiff's experts, a former JPD officer, testified that he had suggested Rebelwood use off-duty JPD personnel as paid security officers, and the Rebelwood manager testified that this was denied for budgetary reasons and also because Rebelwood would be required to indemnify police officers.

¶25. No witness testified at trial about how Coleman and Ellis came to be together on the night of her death. The police investigation revealed that Ellis and Crystal spent the evening drinking beer, smoking, and going back and forth to various stores buying things for themselves and for Larry.

¶26. A resident of Rebelwood, Tara Sparkman, testified to having seen Coleman and Ellis together in the early morning hours of January 11, 2007. Investigators from JPD testified that no one at Rebelwood reported having heard a gunshot, and no officer had heard the name Tara Sparkman before trial. She testified that she got up during the middle of the night, never specifying a time, because her daughter was not in her bedroom. Failing to find her daughter, she went outside and saw Coleman and Ellis sitting in the car with their heads

"bobbing" as if they were "having a conversation." She said she continued walking around after she had seen them. She continued to look for her daughter and noticed a number of people standing outside. They told her they had not seen her daughter, so she continued walking. Subsequently, she said she "heard a pow." She testified she did not know it was a gun because it sounded smothered. She testified that she saw Ellis get out of the car and walk over to his grandmother's apartment at Rebelwood. Sparkman said that, upon returning to her apartment, she found her daughter there, "so I was fine and went to bed."

¶27. One of English's expert witnesses, Ken Goodrum, testified that it was a fact that the shooting occurred at Rebelwood. Another of English's expert witnesses, Tyrone Lewis, Deputy Chief of JPD, testified as follows: "[T]here is no documentation, no written statements or anybody to come forward to say that it did not happen [at Rebelwood]." He further testified that he read on the police report where the shooting occurred. Expert John Tisdale responded to a hypothetical question that, even if Crystal and Ellis had been in a relationship and if the shooting had occurred elsewhere, it would make no difference regarding proximate cause. Tisdale also stated it was a fact the shooting had occurred at Rebelwood. However, he admitted that he had not read Jones's reports, and that certainly it would be important to review all the investigative material compiled by JPD.

¶28. English's economic expert, Dr. Glenda Glover, testified that Crystal's loss of income was $1,163,060, using a national-average figure of $38,651 for Crystal's annual income in the base year, 2007. Crystal had an earnings history of more than five years and had never earned that amount. Crystal's hourly wage was $6.70. According to her tax returns, her income in 2005 and 2006 was $10,585 and $13,099, respectively. Dr. Glover's report states,

11

"Though she was earning $6.70 at the time of her death, in applying the earnings capacity approach, income of $38,651 is used based on the National Income Average."

¶29. During direct examination, English's counsel asked Dr. Glover, "Now, let's talk about this little thing that I like to call 'The Mississippi Black Effect.' Tell the jury . . . how that [affects] the numbers . . . ." After an objection, English rephrased the question.[1] Dr. Glover answered as follows:

> [T]here is an inherent assumption in that a black person in Mississippi has no value, that life is almost valueless. If the life, if you're going to be say $6.70 an hour for life for an individual at age 23, just because that person was working in preparation for something else, for a higher profession, I mean, that's why we use that national average because it eliminates that discriminatory on [sic] the numbers.

Dr. Glover stated on cross-examination, "What I'm assuming is that – I'm going to apply the national average to her life. I'm not going to apply at $6.70 because that's not her value. I'm not going to get into the black-woman-no-value theory, and we're not going to go there. I refuse to go there with you today."

¶30. Some JPD investigating officers who testified were severely limited in their testimony. Jones testified regarding the police investigation. When Rebelwood attempted

---

[1]The following exchange occurred:

Rebelwood: Your honor, I don't know, maybe I didn't hear that correctly. Did you say the Mississippi Black Effect?

English: Yes.

Rebelwood: I don't think – and I looked at her report, but I don't see anything about that. I object, and I don't know what he's talking about.

to ask Jones if he had any information on where the shooting had occurred, the court sustained English's objection. Jones then testified by proffer regarding Ellis's statement, including Ellis's claim of having confessed to his mother, uncle, and cousin. Following the proffer, the court again ruled the evidence inadmissible. While the jury was still out, Rebelwood proposed a specific question for the witness, and the court said twice that it would be allowed. However, when the question was asked, the court sustained a hearsay objection.

¶31. Rebelwood management at the time of Crystal's death did not know Ellis and testified that Jones had not reported any incident involving Ellis.

## STATEMENT OF ISSUES[2]

¶32. As we are remanding for a new trial, we need not address all issues raised. We shall address the following issues:

Issue I.    Exclusion of the JPD incident and investigative reports, statements (including the assailant's statement) and affidavit.

Issue II.   Allowing Plaintiff's economist to use the earning-capacity approach and national-average incomes to calculate loss of future earnings as opposed to relying on the decedent's actual earnings.

---

[2]Other issues raised were:

(1) Plaintiffs failed to prove that the alleged lack of security at Rebelwood Apartments caused Ms. Coleman's death; thus the trial court erred in failing to grant Defendants' motions for directed verdict and judgment notwithstanding the verdict.

(2) The trial court erred in failing to reduce the verdict for noneconomic damages in accordance with Mississippi Code Section 11-1-60.

13

## STANDARD OF REVIEW

¶33.    This Court reviews the admission or exclusion of evidence under an abuse-of-discretion standard of review.  *Hartel v. Pruett*, 998 So. 2d 979, 984 (Miss. 2008) (citing *Tunica County v. Matthews,* 926 So. 2d 209, 212 (Miss. 2006)).

## ANALYSIS

¶34.    Our discussion of the issues includes the trial court's related rulings in limine and at trial regarding exclusion of police narrative reports, affidavit, signed and recorded statements, *inter alia*, and the trial court's failure to perform its gate-keeping responsibility in allowing an expert witness to opine in a manner inconsistent with the laws and rules of this state.

### I.    Exclusion of the JPD Incident and Investigative Reports, Statements  (including the assailant's statement), and Affidavit.

¶35.    English moved pretrial to exclude "any and all use of the Jackson [police] report that contains statements from witnesses that are hearsay, arguing that the prejudicial value outweighs the probative value, and there are no MRE 803 exceptions that would allow the hearsay statements."  Rebelwood replied that Ellis's statement and/or the portions of the police reports containing facts learned in the investigation were admissible, conceding that portions might appropriately be excluded.  *See* Miss. R. Evid. 803(8).

¶36.    Even though police reports, if offered in evidence to prove the truth of the matter asserted are hearsay and the information within them may be based on hearsay, they may be admissible under the hearsay exception in Rule 803(8).  *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 162 n.6, 167-68, 109 S. Ct. 439, 446, 448-49, 102 L. Ed. 2d 445 (1988);

14

*Copeland v. City of Jackson*, 548 So. 2d 970, 975 (Miss. 1989). Although admissible, a trial court need not admit a report in whole or in part, where "the sources of information or other circumstances indicate a lack of trustworthiness." *Rainey*, 488 U.S. at 167-68. In this case, the trial court abdicated its responsibility to perform a trustworthiness analysis. A trial judge should consider the safeguards in the other rules of evidence, such as relevance and prejudice. *Id.* The *Rainey* Court stated that the "ultimate safeguard [was] the opponent's right to present evidence tending to contradict or diminish the weight of those conclusions." *Id.* at 168. Here, significant portions of the police report were admissible, for numerous indicia of trustworthiness were present and the report contained a signed statement by witness Tyra James.

¶37. The relevance is exceedingly clear, for when English's experts provided testimony contrary to the findings of fact contained in the police report, Rebelwood was denied a right to effectively cross-examine the experts on their testimony that was refuted by the police report, including the underlying facts upon which their opinions were based. *See* Miss. R. Evid. 702, 705. The result was that the jury was provided "a distorted and prejudicial impression" of the contents of the police report, and Rebelwood's "counsel was unable to counteract this prejudicial impression by . . . cross-examination." *See Rainey*, 488 U.S. at 170-71.

¶38. English's experts testified that they had relied on portions of the police reports to formulate their opinions, but Rebelwood was prohibited from effective cross-examination designed to impeach their opinion testimony by revealing the contents of the reports they allegedly had relied upon. An abbreviated version of Ellis's statement would read, 'I shot

15

a friend, . . . Crystal, . . . at Woodbine.' The only portion disclosed to the jury was, 'I shot . . . Crystal . . . .' As a result of the trial court's decision to exclude the entirety of the police reports, and then not to reconsider his rulings as the case unfolded, witnesses were not permitted to testify that they had concluded that the shooting had occurred somewhere other than at Rebelwood. The error was compounded exponentially when Roberts testified that the facts showed that the shooting had happened at Rebelwood (according to Rebelwood's counsel, minutes before taking the stand, Roberts had told him that it happened at Woodbine), and by the court's continued rulings excluding evidence reflecting the exact opposite.

¶39. Part of the excluded exhibit included findings of fact contained in a sworn affidavit Jones presented to a court to obtain an arrest warrant. The erroneous ruling allowed plaintiff's expert, Tyrone Lewis, to testify with impunity and without fear of exposure, "[T]here is no documentation, no written statements or anybody to come forward to say that it did not happen [at Rebelwood]." The trial court should have known that Lewis's statement was untrue. In fact, repeated references and statements to the contrary exist throughout the investigative reports. A cursory examination would reveal this truth. Under either scenario, Lewis's statement was patently erroneous and violated the purpose and construction of our Rules ("that the truth may be ascertained and proceedings justly determined"). Miss. R. Evid. 102. The jury was left with a false impression, and Rebelwood clearly was prejudiced. Rebelwood was denied a fundamentally fair opportunity to cross-examine, not only English's experts on the facts giving rise to their opinions about the circumstances and location of the shooting, but other witnesses as well. Conversely, when Jones attempted to testify to his

16

documented findings of fact, the court sustained English's objection, despite the court having agreed earlier to allow the question and answer. Thus, *Rainey*'s "ultimate safeguard" was violated. *See Rainey*, 488 U.S. at 168.

¶40. The codification of the common-law doctrine of completeness underlies rule 106. *See Rainey*, 488 U.S. at 171; Miss. R. Evid. 106. The *Rainey* Court spoke eloquently on this doctrine, quoting a treatise, "[T]he opponent, against whom a part of an utterance has been put in, may in his turn complement it by putting in the remainder, in order to secure for the tribunal a complete understanding of the total tenor and effect of the utterance." *Id.* The Court found it a "reaffirmation of the obvious: that when one party has made use of a portion of a document [the police investigative file, including Ellis's confession and the detectives' narratives], such that misunderstanding or distortion can be averted only through presentation of another portion, the material required for completeness is *ipso facto* relevant and therefore admissible under rules 401 and 402." *Id.* at 172 (emphasis in original).

¶41. *Rainey* settled a U.S. circuit-court split over the scope of Rule 803(8)(C) – whether "factual findings" encompassed "opinions" or "conclusions." *Rainey*, 488 U.S. at 161-62. The Court agreed with the "broader interpretation," holding "that factually based conclusions or opinions are not on that account excluded from the scope of Rule 803(8)(C)." *Id.* at 162. *See* Fed. R. Evid. 803(8)(C). A case cited favorably for this proposition "involved a police officer's report on an automobile accident" and the officer's conclusion, based in part on the officer's interview of one of the drivers. *Id.* at 162 n.6 (citing *Baker v. Elcona Homes Corp.*, 588 F.2d 551, 555, 557-58 (6th Cir. 1978)). The Court differentiated "fact" from "factual finding" by defining a "finding of fact" as a "'conclusion by way of reasonable

inference from the evidence.'" *Rainey*, 488 U.S. at 163-64 (quoting *Black's Law Dictionary* 569 (5th ed. 1979)).

¶42.    Mississippi caselaw is in accord.  A conclusion in a police report may be admitted if "based on a factual investigation and [it] satisfies the Rule's trustworthiness requirement." *Fleming v. Floyd*, 969 So. 2d 881, 885 (Miss. Ct. App. 2006) (*rev'd on other grounds by* 969 So. 2d 868 (Miss. 2007)) (quoting *Rainey*, 488 U.S. at 170).  *See also Jones v. State*, 918 So. 2d 1220, 1231-32 (Miss. 2005).   In criminal cases, a similar rule applies, allowing a defendant to counter the State's use of portions of a confession with the relevant and material portions of the remainder.  *See Sanders v. State*, 237 Miss. 772, 776-77, 115 So. 2d 145, 147 (1959).

¶43.    We find that Jones's documented narrative reports and affidavit and his factual investigation satisfy our Rules' requirement of trustworthiness.  Ellis's statements to his mother, uncle, and cousin and his confession at the police station were consistent, were made soon after the crime, and were against his penal interest.  The police statement was voluntary and was made after he had been apprised of his rights.[3]  The location of the shooting was neither exculpatory or inculpatory.  Ellis had no reason to lie about the location, as he would not have known about this civil suit and any effect the location might have.  His statement was corroborated by similar statements to his mother, cousin, and uncle.  The similar statements to each were corroborated by separate statements taken from each of them.  Physical evidence corroborated the statements, but for intentional versus accidental shooting.

---

[3]*See Miranda*, 384 U.S. at 444-45.

18

¶44.   *Rainey* lists the four factors the Advisory Committee on Evidence Rules proposed for consideration of trustworthiness: "(1) the timeliness of the investigation; (2) the investigator's skill or experience; (3) whether a hearing was held; and (4) possible bias when reports are prepared with a view to possible litigation." *Rainey*, 488 U.S. at 168 n.11.   Jones's investigation began shortly after discovery of the crime with an initial narrative report in the early morning hours of January 11, 2007.   Jones's skill and experience were that of a lead homicide investigator, a seven-year veteran of the police force, who had worked in the homicide division for three years.   His sworn findings of fact were used at a hearing before another court to obtain an arrest warrant against Ellis. The report was not prepared with a view to possible civil litigation, while the unsupported opinions of English's experts were. Thus, we find that Jones's narrative reports and affidavit meet the trustworthiness requirement, and, thus, it was reversible error for the trial court initially to exclude the police report in its entirety.   Further, the error was compounded by not adjusting the ruling when English's experts testified.

¶45.   Trustworthiness is to be judged by the circumstances known at the time the information was received by the officer charged with the responsibility of investigating and preparing the report and not by testimony developed during the trial, which was not available to the trial judge at the time that he excluded the evidence.

¶46.   The issue before the Court is Jones's findings of fact and conclusions drawn from the information available to him at the time the narrative reports and sworn affidavit were prepared.   The information recorded by Jones was transmitted to him by a person with knowledge, Ellis. *See also* Miss. R. Evid. 803(6).   Jones also had available at that time the

circumstances surrounding the event, including physical evidence and corroborative statements which were obtained during his investigation. *Rainey* clearly holds that the admission of findings of fact encompasses opinions and conclusions of the person charged with completing the report. *Rainey*, 488 U.S. at 161-64.

¶47. We find that the trial court abused its discretion in failing to perform a trustworthiness analysis before excluding the police report in its entirety and in failing to allow cross-examination of English's experts and Roberts using the police report when each liability expert testified that he had relied at least in part on the excluded document to formulate his opinion.

II. **Allowing Plaintiff's economist to use the earning-capacity approach and national-average incomes to calculate loss of future earnings as opposed to relying on the decedent's actual earnings.**

¶48. "'[T]he admission of expert testimony is within the sound discretion of the trial judge . . . . Therefore, the decision of a trial judge will stand unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion.'" *Kilhullen v. Kansas City S. Ry.*, 8 So. 3d 168, 172 (Miss. 2009) (quoting *Miss. Transp. Comm'n v. McLemore,* 863 So. 2d 31, 34 (Miss. 2003)). "'Mississippi law requires the trial court to ensure that proposed [expert] testimony satisfies Rule 702 . . . .'" *Kilhullen*, 8 So. 3d at 172 (quoting *Univ. of Miss. Med. Ctr. v. Pounders,* 970 So. 2d 141, 146 (Miss. 2007)). In *McLemore*, this Court adopted the "*Daubert/Kumho Tire* rule as the standard for admissibility of expert witness testimony." *McLemore*, 863 So. 2d at 35-40. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999);

***Daubert v. Merrell Dow Pharms., Inc.***, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

¶49.    Rebelwood sought pretrial to exclude Glover's opinion.  Rebelwood argues that permitting Glover to base her calculations on national-average income and an "earnings-capacity approach" did not satisfy ***Daubert*** standards in that her proposed opinion was not based on "sufficient facts or data . . . ."  *See* Miss. R. Evid. 702.  If this is correct, the opinion lacked reliability.  Rebelwood claims that Glover justified her use of national averages through "an overt attempt to inject improper racial considerations into the jury's deliberations."  English counters that our caselaw allows use of national averages under these facts and that there was no improper injection of race.

¶50.    Rule 702 provides:

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) *the testimony is based upon sufficient facts or data*, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Miss. R. Evid. 702 (emphasis added).  Rebelwood conceded that Glover qualified as an expert, but argued that her proposed testimony was not based on sufficient facts.  Stated otherwise, her opinion, as presented in this case, was not based on accurate, truthful facts.

¶51.    This court has held that an expert's qualification and reliability of testimony are separate questions.  *See **Bullock v. Lott***, 964 So. 2d 1119, 1129 (Miss. 2007).  In ***Bullock***, this Court ordered a new trial, finding that a witness "met the ***Daubert*** qualifications to testify as an expert in the fields tendered, [but] portions of [the] testimony were not based on

sufficient facts or data." *Id.* at 1129, 1133. Expert testimony must be relevant and based on fact.[4] *See Treasure Bay Corp. v. Ricard*, 967 So. 2d 1235, 1242 (Miss. 2007) (testimony "not based upon the facts [was] therefore unreliable"); *Matthews*, 926 So. 2d at 213-14; *APAC-Miss., Inc. v. Goodman*, 803 So. 2d 1177, 1185 (Miss. 2002) ("'[t]he facts upon which the expert bases his opinion must permit reasonably accurate conclusions as distinguished from mere guess or conjecture.'") (citation omitted).

¶52.   English argues that this Court's precedent allows this testimony under these facts. *See Spotlite Skating Rink, Inc. v. Barnes ex rel. Barnes*, 988 So. 2d 364 (Miss. 2008); *Classic Coach, Inc. v. Johnson*, 823 So. 2d 517 (Miss. 2002); *Greyhound Lines, Inc. v. Sutton*, 765 So. 2d 1269 (Miss. 2000); *Flight Line, Inc. v. Tanksley*, 608 So. 2d 1149 (Miss. 1992). Each of these cases is clearly distinguishable and not applicable to the case at bar.

¶53.   In *Tanksley*, an adult was injured, and the dispute was over an expert's estimate of the increase in Tanksley's salary, had he not been injured. *Tanksley*, 608 So. 2d at 1153, 1165. Tanksley's base income was established by his actual income in the five years before the injury. *Id.* at 1165. This Court found no error in the admission of this testimony, as "there was in the record a colorable factual predicate upon which [the expert] might base his opinion." *Id.* Here, no colorable factual predicate exists. Glover based her opinion, including for the year of Crystal's death, on the national-average salaries of high-school graduates and registered nurses with a bachelor of science degree, totally ignoring Crystal's actual income before her death. Even if Coleman had begun a nursing-assistant training

_____

[4]The same could be applied to English's liability experts.

program immediately, and then had gone on to nursing school, it would have taken years for her to reach an annual salary of $38,000.

¶54.    In *Sutton*, three children, the oldest of whom was eight, were killed. *See Sutton*, 765 So. 2d at 1270-71. The jury awarded lost income based on an expert's estimate of the children's income using national averages for high-school graduates. *Id.* at 1276. After the Court of Appeals reversed, holding that income awards should reflect a community standard, this Court reinstated the award. *Id.* at 1271. Justifying its decision on the rationale that courts should not assume that individuals are "shackled by the bounds of community or class," this Court held that:

> in cases brought for the wrongful death of a child where there is no past income upon which to base a calculation of projected future income, there is a rebuttable presumption that the deceased child's income would have been the equivalent of the national average as set forth by the United States Department of Labor.

*Id.* at 1276-77. In *Barnes*, dealing with the death of a ten-year-old, this Court reaffirmed *Sutton*. *Barnes*, 988 So. 2d at 371 ("This Court's adoption of *Daubert* is not a basis for amending *Sutton*."). Here, Crystal was twenty-three years old and had three children and an earnings history of more than five years. Thus, *Sutton* and *Barnes* provide no support for English.

¶55.    In *Johnson*, this Court applied a modified *Sutton* rule in a case involving the wrongful death of two college students. *Johnson*, 823 So. 2d at 528-29. One was enrolled in college at the time of his death; the other had been in college, but was sitting out a semester to earn money to return. *Id.* at 528. An expert presented three calculations of lost income: (1) minimum wage; (2) high-school-graduate national average; (3) college-graduate

national average. *Id.* The trial judge, in this bench trial, accepted the college-graduate average. *Id.* at 519, 529. The only evidence presented in rebuttal of the *Sutton* presumption was that neither decedent had completed college. *Id.* at 529. This Court affirmed the trial court's judgment. *Id.* at 530. English argues that the extension of the *Sutton* rule to college students brings this case into its ambit. Here, although there was meager evidence of an intent to return to school, Coleman was not in college and no evidence was presented that she had even applied for admission. Thus, *Johnson* is likewise clearly distinguished.

¶56. Rebelwood asserts that Glover injected race into her testimony to justify the use of national averages. The "Mississippi Black Effect" question, and Glover's response to a rephrased question are not just side issues, as English argues. Race was injected at least twice in Glover's testimony: first, upon prompting by English's counsel, and second, when asked by Rebelwood's counsel how she could assume a base income of more than $38,000. This Court has held it error to allow "irrelevant, prejudicial and inflammatory statements." *Gen. Motors Acceptance Corp. v. Baymon*, 732 So. 2d 262, 272 (Miss. 1999). The *Baymon* Court found that, through the "unsupported declarations of [Baymon's] expert and counsel," the "trial counsel had blatantly played the 'race card' . . . ." *Id.*

¶57. An equally important flaw in Glover's opinion is a conceptual one. In providing a framework for determination of lost future income, courts are not determining the "value" of a person. Courts are merely ensuring a "reasonable and workable system for establishing damages . . . ." to replace what has been lost. *See Culver v. Slater Boat Co.*, 722 F.2d 114, 121 (5th Cir. 1983). The *Culver* Court stated, "The paramount concern of a court awarding

24

damages for lost future earnings is to provide the victim with a sum of money that will, in fact, replace the money that he would have earned." *Id.* at 120.

¶58. We find that the trial court abused its discretion in admitting Glover's testimony. The testimony fails the requirement that it be based on sufficient facts or data. Our caselaw does not support the use of the assumptions she utilized under the facts of this case. For all of the foregoing reasons, we find that Glover's testimony regarding lost future income was inadmissible.

¶59. As methodology likely will be an issue upon remand, we note other deviations from the proper method of determining lost future income: (1) assuming that Coleman would have worked until age sixty-five, as opposed to using nationally accepted tables for work-life expectancy; (2) adding fringe benefits that Coleman never received; and (3) using "ballpark" figures. *Culver* set out a four-step process to calculate lost income stream. *Id.* at 117 ("estimating the loss of work life resulting from the injury or death, calculating the lost income stream, computing the total damage, and discounting that amount to its present value"). This Court has done the same. *See Sutton*, 765 So. 2d at 1275 ("take the projected annual future income of the deceased multiplied by their work life expectancy, discount it to present cash value and deduct a percentage for the deceased's personal living expenses"). Personal consumption must be taken into account. *See Barnes*, 988 So. 2d at 371; *Sutton*, 765 So. 2d at 1278; *Culver*, 722 F.2d at 117 n.3. Fringe benefits must not be added unless they actually have been received. The testimony in the case sub judice is that Crystal's employment did not provide fringe benefits. *See Tanksley*, 608 So. 2d at 1161, 1166. Work-

25

life expectancy cannot be assumed, but must be based on an objective standard. *See **Sutton***, 765 So. 2d at 1276; ***Ill. Cent. R.R. Co. v. Gandy***, 750 So. 2d 527, 530 (Miss. 1999).

¶60.　The ***Culver*** Court closed its opinion with this explanation of its holding:

> Courts are not prophets and juries are not seers. In making awards to compensate injured plaintiffs or the dependents of deceased workers for loss of future earnings, however, these fact-finders must attempt, in some degree, to gauge future events. Absolute certainty is by the very nature of the effort impossible. It is also impossible to take into account every bit of potentially relevant evidence concerning the tomorrows of a lifetime. The approach we adopt attempts to assure plaintiffs a fair measure of damages, to give defendants a reasonable adjustment for reducing future losses to present value, and to avoid making trials even more complex and their results even more uncertain. It is the product of a balancing of competing values. Ultimately, however, that is the root of all justice.

***Culver***, 722 F.2d at 123. In limiting the basis for the lost income stream to actual income, courts do not determine the value of injured people or speculate on their capacity for more remunerative employment. Our law is designed to assure a fair and predictable determination to replace what has been lost.

## CONCLUSION

¶61.　The judgment of the Circuit Court of the First Judicial District of Hinds County is reversed and remanded for a new trial.

¶62.　**REVERSED AND REMANDED.**

**CARLSON AND GRAVES, P.JJ., DICKINSON, LAMAR, AND PIERCE, JJ., CONCUR. KITCHENS, J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION. CHANDLER, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. WALLER, C.J., NOT PARTICIPATING.**

**KITCHENS, JUSTICE, CONCURRING IN PART AND IN RESULT:**

26

¶63.    I agree that this case should be reversed and remanded.  However, I write separately to discuss my disagreement with the majority's holding that the trial court abused its discretion in allowing expert testimony from Dr. Glenda Glover.  Therefore, I concur in part and in result.

¶64.    The majority acknowledges Rebelwood's concession that Dr. Glenda Glover is qualified as an expert in economics, but goes on to say that ". . . her opinion, as presented in this case, was not based on accurate, truthful facts."

¶65.    The accuracy or truthfulness of facts is a matter to be sorted out by a jury.  *See Davis v. Temple*, 91 So. 689, 690 (Miss. 1922).  If Rebelwood, or any other party to the litigation, disagrees with facts presented and/or relied upon by its adversary, its remedy is not to have that evidence excluded by a judge.  Rather, a party in disagreement with its opponent's factual representations is at liberty to expose the perceived inaccuracies by cross-examination, and by the presentation of different, opposing evidence through its own witness.

¶66.    Rebelwood had those options in this case.  Its disagreement with Dr. Glover's methodology and her conclusions could have been presented to the jury through an opposing expert, an option which Rebelwood chose not to exercise.

¶67.    In the recent case of *Gulf South Pipeline Co., LP v. Pitre*, 35 So. 3d 494 (Miss. 2010), we undertook to prescribe the methodology to be utilized by real estate appraisers.  Now, we take on that same task in the field of economics.  Is there no field of human endeavor in which this Court does not believe itself to know more than the real experts?  Are there no limits upon the substitution of our judgment for that of the jurors who hear and observe the testifying experts for the parties to the disputes that juries exist to decide?  Once

27

Dr. Glover had been accepted by the trial court as an expert in her field, the efficacy of her opinions, or the lack thereof, was for the jury to decide. The so-called "gate-keeping" role of the court ended when the trial judge allowed her to enter the gate by accepting her as an expert, a duty which Rebelwood concedes the trial judge properly performed.

¶68. In this case, Dr. Glover, whose qualifications as an economist are not in dispute, based her calculation of Crystal's future income on the national average income of a high school graduate with aspirations of becoming a nurse. Dr. Glover testified that she learned of Crystal's aspirations of becoming a nurse from Crystal's father and other relatives who reported that she had obtained applications from Hinds Community College and Mississippi College as a step toward fulfilment of the educational requirements for a career in nursing.

¶69. The plaintiffs relied on *Classic Coach, Inc. v. Johnson*, 823 So. 2d 517 (Miss. 2002). In *Classic Coach*, this Court found it permissible for an expert economist to calculate the future income of two college-aged men who were killed in an accident. One of them was twenty-one years of age, had one child, and had worked at Waffle House and played in a band for several years while working toward his college degree. *Id.* at 528. The other young man had recently dropped out of college for a semester to earn money to finance the remainder of his education. *Id.* In *Classic Coach*, the expert calculated future income based on three different averages: (1) an individual earning minimum wage; (2) average wage for a high school graduate; and (3) average wage for a college graduate. The trial judge accepted the calculation for that of the average college graduate, even though one of the young men had a several-year work history and the other had left college to work, when awarding damages for the loss of these individuals' future income. *Id.* The calculation in *Classic*

28

*Coach* is analogous to that in the case *sub judice*. Dr. Glover based the lost income of Crystal on that of a high school graduate with aspirations of becoming a nurse.

¶70. Rebelwood failed to adduce evidence to contradict the conclusions of Dr. Glover. This Court has long held that uncontradicted testimony which was not impeached must be accepted as true. *See James v. Mabus*, 574 So. 2d 596 (Miss. 1990) (inherently probable, reasonable, credible, and trustworthy testimony uncontradicted by evidence must be accepted as true); *Hearin-Miller Transporters, Inc. V. Currie*, 248 So. 2d 451 (Miss. 1971) (testimony of a witness which is not contradicted, either by direct evidence or by circumstances, must be taken as true); *Hulitt v. Jones*, 72 So. 2d 204 (Miss. 1954) (same); *Tombigbee Elec. Power Ass'n v. Gandy*, 62 So. 2d 567 (Miss. 1953) (where testimony of witness is uncontradicted and he is not impeached in some manner known to the law nor contradicted by the physical facts, such testimony must be accepted); *Ryals v. Douglas*, 39 So. 2d 311 (Miss. 1949) (the uncontradicted testimony of witness who is not impeached must be accepted as true); *Stevens v. Stanley*, 122 So. 755 (Miss. 1929) (jury as well as judge is bound by uncontradicted reasonable testimony); *Stewart v. Coleman & Co.,* 81 So. 653 (Miss. 1919) (testimony must be taken as true where not contradicted either by direct evidence or by circumstances).

¶71. Finally, Rebelwood alleges that "[r]ace was injected" into the economist's testimony by Dr. Glover's responding to a question regarding the "Mississippi Black Effect." A thorough review of the record reveals that the plaintiffs' attorney and Dr. Glover were discussing the low salaries of persons living in Mississippi and Arkansas. Thereafter, Plaintiffs' counsel asked how the "Mississippi Black Effect" affects the salary of someone

29

in Crystal's position. Defense counsel objected, and Plaintiffs rephrased the question to ask, "Explain to the jury in the process of doing these economic reports how the numbers relate to somebody is [sic] . . . poor as opposed to somebody who is rich and if those are considerations that you look at." The colloquy went on as follows:

A.     Well, economist[s] are well aware of the disparity in numbers, again, in Mississippi and in Arkansas, but normally, since we're talking about Mississippi, there is a disparity because if you look at the $6.70 and use that over her life – well, I'm just going to say, you know, there is an inherent assumption in that a black person in Mississippi has no value, that life is almost valueless. In the life, if you're going to be say $6.70 an hour for life for an individual at age 23, just because that person was working in preparation for something else, for a higher profession, I mean, that's why we use the national average because it eliminates that discriminatory [sic] on the numbers.

Q.     And in all fairness, that would also apply to white people, too?

A.     Yeah. Poor, it's poor in general, but it's more often applied to black Americans in the models that we have come in contact with.

¶72.   The foregoing is a legitimate part of Dr. Glover's explanation of her methodology and is a far cry from her having played a "race card," as suggested by the majority. Therefore, *Gen. Motors Acceptance Corp. v. Baymon*, 732 So. 2d 262 (Miss. 1999), is inapplicable. The trial court did not err in allowing Dr. Glover to use a national average to calculate the value of Crystal's future income.

¶73.   For the foregoing reasons, I respectfully concur in part and in result.

**CHANDLER, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶74.   I write separately to express my disagreement with the majority's determination that the hearsay statements by Ellis contained within the police investigative file were admissible

30

under the public-records exception to the hearsay rule. M.R.E. 803(8)(C). This issue concerns double hearsay and triple hearsay: the police investigative file itself, and Ellis's statements, contained within the file, made to the investigating officer and to other witnesses who spoke to the investigating officer. While it is the general rule that police reports may be admitted under the public-records exception, it is also true that "hearsay statements by third persons . . . are not admissible under this exception merely because they appear within public records." *U.S. v. Mackey*, 117 F.3d 24, 28 (1st Cir. 1997). To admit such statements, another hearsay exception must apply. *See* M.R.E. 805 ("[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules"). The trial court properly determined that no hearsay exception applied to Ellis's statements, and excluded them from evidence. I would affirm this ruling.[5] I agree with the majority's holding that the expert testimony of Dr. Glover was unreliable. Therefore, I concur in part and dissent in part.

¶75.   The scope of this separate opinion is limited to whether the hearsay statements by Ellis and Ellis's family members were admissible as substantive evidence. At trial, Rebelwood sought to introduce statements Ellis and members of his family had made to officers with the Jackson Police Department by introducing components of the investigative file that contained these statements. Mississippi Rule of Evidence 803(8) provides:

> **Public Records and Reports.** Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty

---

[5] I do not address the majority's analysis of the impeachment issue because I agree with the majority's analylsis of that issue.

31

imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) *in civil actions* and proceedings and against the state in criminal cases*, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.*

M.R.E. 803(8) (emphasis added). According to the comments prepared by the advisory committee on Federal Rule of Evidence 803(8), the "[j]ustification for the exception is the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record." F.R.E. 803(8) cmt.

¶76. In *Beech Aircraft v. Rainey*, 488 U.S. 153, 169-70, 109 S. Ct. 439, 449-50, 102 L. Ed. 2d 445 (1988), the United States Supreme Court held that the provision of Federal Rule of Evidence 803(8)(C) that permitted the admission of "factual findings" encompassed opinions and conclusions, as well as facts. The issue of double hearsay was not before the *Beech* court. The Fifth Circuit has devised a three-part test for the admissibility of reports under Rule 803(8)(C): (1) that the record sought to be admitted must be made from matters within the firsthand knowledge of the official making the record or his agent, or someone with a duty to report the matter to a public official; (2) the report must have been prepared pursuant to a duty imposed by law; and (3) the reports offered must not indicate a lack of trustworthiness. *U.S. v. Central Gulf Lines, Inc.*, 974 F.2d 621, 626 (5th Cir. 1992). The Court cited the nonexclusive, four-factor test for trustworthiness devised by the advisory committee and cited in *Beech*: (1) the timeliness of the investigation, (2) the investigator's skill or experience; (3) whether a hearing was held; and (4) possible bias when reports are prepared with a view to possible litigation. *Id.* at 627 (citing *Beech*, 488 U.S. at 168 n.11).

32

¶77. It is well-established that hearsay statements are not automatically admissible by virtue of their appearance within an investigative report. *Mackey*, 117 F.3d at 28. The emphasis for admissibility under Rule 803(8) focuses on the extent to which the report reflects the firsthand knowledge or observation of the investigator. This requirement of firsthand knowledge dovetails with the Rule's requirement of trustworthiness; therefore, as a general rule, "hearsay statements by third persons . . . are not admissible under this exception merely because they appear within public records." *Id.* "This is the same 'hearsay within hearsay' problem that is familiar in many contexts." *Id.* at 28-29; *see* M.R.E. 805. "Investigative findings fit the [Rule 803(8)] exception even if they rest on outsider statements, but the exception does not permit use of the statements themselves to prove what they assert." Christopher B. Mueller and Laird C. Kirkpatrick, *Evidence* 863-64 (3d. ed. 2003).

¶78. The advisory committee's comments to Federal Rule of Evidence 803(8) state that "[p]olice reports have generally been excluded except to the extent to which they incorporate firsthand observations of the officer." F.R.E. 803(8) cmt. Accordingly, courts routinely have struck hearsay not within an exception from investigative reports prior to admission of the reports into evidence. *U.S. v. Pagan-Santini*, 451 F.3d 258, 264 (1st Cir. 2006); *EMK, Inc. v. Fed. Pac. Elec. Co.*, 677 F. Supp. 2d 334, 337 (D. Me. 2010); *see* M.R.E. 805. Courts also have held that an investigative report that otherwise would have been admissible as a public record was inadmissible because it primarily consisted of a transcript of hearsay statements received during the investigation. *U.S. v. Ortiz*, 125 F.3d 630, 632 (8th Cir. 1997); *U.S. v. D'Anjou*, 16 F.3d 604, 610-11 (4th Cir. 1994). This Court also has recognized that "there

may be notations in . . . a [police] report which are recitations of statements of others, and would be inadmissible even though the officer were present in court testifying." ***Copeland v. City of Jackson***, 548 So. 2d 970, 975-76 (Miss. 1989).

¶79. In its brief, Rebelwood essentially admits that Rule 803(8) is inapplicable to Ellis's statements by arguing that another hearsay exception or exclusion had to apply in order to admit those statements into evidence. Rebelwood states that: "[p]olice reports generally are admissible under Miss. R. Evid. 803(6) . . . or 803(8)," and "[d]efendants examine the admissibility of the information obtained from Ellis without regard to whether that information is communicated through the statement itself, the police investigative reports, the Underlying Facts and Circumstances presented to the District Attorney, or through the testimony of police officers." Rebelwood then proceeds to brief the Court on whether the statements were admissible under Rule 804 or under the Rule 803(24) catch-all exception.

¶80. The majority does not address Rebelwood's arguments, finding that Ellis's statements to the police, although constituting hearsay not within an exception, met the trustworthiness requirement of Rule 803(8) because he also had made similar corroborating statements close in time to his mother, uncle, and cousin. In my opinion, the fact that a murder suspect made similar statements on different occasions is, at best, only minimal corroboration of the statements' contents. Further, the officers' recounting of what each family member reported that Ellis had said constituted triple hearsay. Thus, the corroborating evidence relied upon by the majority was in the form of triple hearsay contained within the same police reports. Moreover, the corroboration cited by the majority pales in light of other information in the investigative file that indicated the untrustworthiness of Ellis's statements concerning the

34

shooting. This information was in the crime-scene report, which stated that Coleman was killed by a close-contact gunshot wound, refuting Ellis's claim of accident. Thus, Ellis's statements were cast into doubt, not corroborated, by other evidence in the file. There is no compelling reason to single out Ellis's statement about where the shooting occurred as being more trustworthy than the rest of his hearsay declarations.

¶81. As this Court previously has recognized, hearsay is not absolved of untrustworthiness by its appearance in a police report. *Copeland*, 548 So. 2d at 975-76. Ellis's statements within the report were hearsay to which no exception applied. Therefore, the trial court's ruling was a correct application of our Rules of Evidence and did not constitute an abuse of discretion. I respectfully concur in part and dissent in part.