# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2018-CT-01550-SCT

*STACIE MURRAY*

*v.*

*JAMES GRAY d/b/a GRAY TRUCKING AND*
*KEVIN PARKER*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 06/28/2018 |
| TRIAL JUDGE: | HON. MARK SHELDON DUNCAN |
| TRIAL COURT ATTORNEYS: | S. MALCOLM HARRISON |
| | MICHAEL E. PHILLIPS |
| | JACOB O. MALATESTA |
| | CLAIRE K. ROBINETT |
| COURT FROM WHICH APPEALED: | SCOTT COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | S. MALCOLM HARRISON |
| ATTORNEYS FOR APPELLEES: | MICHAEL E. PHILLIPS |
| | CLAIRE K. ROBINETT |
| NATURE OF THE CASE: | CIVIL - PROPERTY DAMAGE |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED. THE JUDGMENT OF THE SCOTT COUNTY CIRCUIT COURT IS REVERSED AND REMANDED - 07/22/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**GRIFFIS, JUSTICE, FOR THE COURT:**

¶1.    In this certiorari case, we consider whether allowing cross-examination of an expert witness with the accident report and a judicial opinion from another case amounted to reversible error.  We also consider whether cumulative error requires a new trial.  We affirm

the judgment of the Court of Appeals for the reasons set forth in this opinion, and we reverse the judgment of the Scott County Circuit Court and remand the case for a new trial.

## FACTS AND PROCEDURAL HISTORY

¶2. On the night of April 1, 2014, Stacie Murray was driving home from work in the northbound lane on Highway 35 in Scott County. Kevin Parker, while in the course and scope of his employment with James Gray d/b/a Gray Trucking (Gray), was driving a fully loaded log truck in the southbound lane. The two vehicles collided. Murray sued Parker and Gray in the Scott County Circuit Court and alleged that she suffered personal injuries and property damage as a result of Parker's negligence.

¶3. At trial, Murray testified that she was "alert" and "traveling north" on "[her] side of the road" with "no problems." The last thing she remembered just before the accident "was lights." Murray was "[p]ositive" she was in her lane when she saw the lights, and she was "certain" the lights she saw were in her lane. On cross-examination, Murray reiterated that she was in her lane at the time of the accident. But she agreed with defense counsel that she did not have a specific "memory of where th[e] collision took place." On redirect examination, Murray again testified that she was in her lane at the time of the accident and that she never deviated into the southbound lane. But on recross-examination, Murray again equivocated as to whether she was certain that she was in her lane at the moment of the collision.

¶4. Parker testified that he was driving his truck in the southbound lane of Highway 35

2

when Murray's car entered his lane and drove "head-on" toward his truck. In order to avoid Murray's vehicle, Parker swerved to the right and drove off the highway about four to six feet. After the collision, Parker brought his truck to a stop along the side of the highway. Parker testified that he never entered Murray's lane and that the collision had occurred entirely in his lane.

¶5.     James Hannah testified for Murray as an expert in accident reconstruction. Hannah testified that he visited the accident scene about two months after the accident and found a "gouge mark" in the highway that, in his opinion, indicated the area of impact. Hannah admitted that the highway patrolman who investigated the wreck, Trooper Greg Lucas, did not find or photograph a gouge mark. Hannah also admitted that he did not know whether the gouge mark was actually caused by the collision. He acknowledged that the gouge mark could have been there before the accident. Hannah did not photograph the gouge mark during his initial visit to the accident scene. When Hannah next visited the scene, about two years later, the highway had been overlaid, and the gouge mark was no longer visible.

¶6.     Gray and Parker filed a pretrial motion to exclude Hannah's testimony and opinions regarding the alleged gouge mark. They argued that Hannah's testimony was based on "mere speculation" and was neither relevant nor reliable. But the trial court denied the motion and allowed Hannah to testify about the gouge mark.[1]

---

[1] Gray and Parker did not cross-appeal the trial court's denial of their pretrial motion. Accordingly, we do not address whether Hannah should have been allowed to testify about the gouge mark.

3

¶7. Hannah testified that the location of the alleged gouge mark indicated that the collision had occurred in the center of the road in the southbound lane—i.e., Parker's lane. Thus, Hannah believed that a portion of Murray's vehicle had crossed into Parker's southbound lane before the collision. Hannah disbelieved Parker's testimony that Parker had swerved four to six feet off the highway in an effort to avoid Murray's vehicle because Hannah "found no information that put [Parker] on the shoulder [of the highway]." But Hannah accepted as true Parker's testimony and theorized that Parker's four-to-six-foot swerve must have started in Murray's lane—i.e., Parker must have invaded Murray's lane before swerving back to his right at the last moment. Hannah opined that Parker had crossed the center line and was at fault.

¶8. Over Murray's objections, defense counsel cross-examined Hannah regarding the Uniform Crash Report (UCR) (i.e., the accident report) that Trooper Lucas prepared after the accident. Defense counsel read directly from the UCR's narrative section, which reflected Trooper Lucas's opinions regarding the vehicles' paths and the cause of the accident. Also over Murray's objections, during cross-examination, defense counsel asked Hannah questions about an adverse **Daubert**[2] ruling in a federal district court opinion and evidence in two other cases in which Hannah had testified as an expert. In addition, defense counsel asked questions as he read from one of the judicial opinions.

¶9. After Murray rested, Gray and Parker called Trooper Lucas to testify. Defense

---

[2] **Daubert v. Merrell Dow Pharms., Inc.**, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

4

counsel asked Trooper Lucas what Parker had told him about the accident that night at the scene, and Murray asserted a hearsay objection. The trial court overruled Murray's objection, and Trooper Lucas testified, "I asked [Parker] what happened. He stated to me that the car come in on him and he swerved right to avoid the car." Trooper Lucas testified that when he asked Murray what happened, "she replied she did not know."

¶10. Trooper Lucas later testified without objection that in his opinion based on his investigation, the collision had occurred in the southbound lane and that Murray's vehicle had crossed the center line and had struck Parker. Trooper Lucas's photographs of the accident scene and debris were admitted into evidence. Over Murray's objection, the UCR that Trooper Lucas prepared was also admitted into evidence. The final page of the report included a diagram and narrative that reflect Lucas's opinions and conclusions that Murray's car had crossed the center line and had caused the collision.

¶11. The jury returned a nine-to-three verdict in favor of Gray and Parker. Murray filed a motion for a new trial, which the trial court denied. Murray timely appealed.

¶12. The Court of Appeals reversed and remanded the case for a new trial. It found

> that a new trial [wa]s required because Murray's hearsay objection [regarding what Parker had told Trooper Lucas the night of the accident] should have been sustained, the UCR should not have been admitted into evidence or read during [the] cross-examination of Murray's expert, and Murray's expert should not have been cross-examined about a court's opinion and evidence from other cases.

*Murray v. Gray*, No. 2018-CA-01550-COA, 2020 WL 4436712, at *1 (Miss. Ct. App. 2020). The court concluded that "Murray [wa]s entitled to a new trial based on the cumulative effect

5

of errors during the first trial." *Id.* at *12.

¶13.     Gray and Parker filed a petition for writ of certiorari and argued that the Court of Appeals erred by determining that the trial court had abused its discretion by (1) allowing Gray and Parker to cross-examine Hannah with the UCR, (2) allowing Gray and Parker to cross-examine Hannah about a judicial opinion in another case, and (3) finding that Murray was entitled to a new trial based on the cumulative effect of errors during the first trial. We granted the petition.

## STANDARD OF REVIEW

¶14.     "An abuse-of-discretion standard of review is applied to the trial court's admission or exclusion of evidence." *Hartel v. Pruett*, 998 So. 2d 979, 984 (Miss. 2008) (citing *Tunica Cnty. v. Matthews*, 926 So. 2d 209, 212 (Miss. 2006)).

## ANALYSIS

   I.     *Whether the trial court abused its discretion by allowing defense counsel to use the UCR to cross-examine Murray's expert.*

¶15.     Gray and Parker argue "that the Court of Appeals erred in its determination that the trial court abused its discretion . . . by allowing Gray and Parker to cross-examine . . . Hannah with the subject UCR." They claim the UCR was properly used during Hannah's cross-examination. In support, Gray and Parker rely on *Rebelwood Apartments RP, LP v. English*, 48 So. 3d 483 (Miss. 2010).

   A.     *Admissibility of Law-Enforcement Accident Reports*

¶16.     Law-enforcement accident reports are not automatically admissible under the

6

Mississippi Rules of Evidence. Whether an accident report is admissible depends on its contents and manner in which it is offered into evidence. Certainly, an officer may testify about the information contained in the accident report that is within the officer's personal knowledge.[3] Often, however, an accident report also contains information that the officer obtained from others, and the officer has no personal knowledge of the facts sought to be admitted.[4] Sometimes, an officer may testify about the contents of the accident report through the officer's opinion as a lay witness (Mississippi Rule of Evidence 701) or opinion as an expert witness (Mississippi Rule of Evidence 702).

### B. *Rebelwood*: *An Exception to the Hearsay Rule*.

¶17. *Rebelwood* was a premises-liability/wrongful-death suit against Rebelwood Apartments, an apartment complex in South Jackson. *Rebelwood*, 48 So. 3d at 485. The decedent, Crystal Coleman, lived at Rebelwood, and her body was found in the front passenger seat of her car in Rebelwood's parking lot. *Id.* She had died from a gunshot wound. Dwight English, the father of Crystal's youngest child, sued Rebelwood and alleged that it had failed to provide adequate security. *Id.* But Cleveland Ellis, III, an acquaintance of Crystal, confessed that he had killed Crystal at another apartment complex and then drove

---

[3]For example, a law-enforcement officer may have personal knowledge of the location of the vehicles after the accident, a diagram of the road, street or intersection where the accident occurred, and the length of skid marks. *See* MRE 602.

[4]For example, an accident report may also include information the officer obtained from witnesses or others at the scene of the accident. Such information obtained from others may be hearsay and may be excluded under Mississippi Rule of Evidence 802, unless an exception to the hearsay rule applies under Mississippi Rules of Evidence 803 or 804.

her body to Rebelwood. *Id.* The Jackson Police Department (JPD) obtained evidence that corroborated Ellis's story. *Id.*

¶18.  Before trial, English filed a motion to exclude the JPD report and argued that the report contained inadmissible and prejudicial hearsay. *Id.* The trial court agreed and excluded the police report. *Id.*

¶19.  At trial, English presented testimony from numerous witnesses that "varied significantly from the witnesses' [prior] statements to JPD officers during the investigation . . . ." *Id.* Additionally, two of English's expert witnesses "testified that it was a fact that the shooting occurred at Rebelwood." *Id.* at 489.  Another of English's expert witnesses, Tyrone Lewis, then the deputy chief of the JPD, even testified that there was "no documentation, no written statements or anybody to come forward to say that it did not happen [at Rebelwood]." *Id.* (alteration in original) (internal quotation mark omitted).  But based on the trial court's pretrial ruling, Rebelwood was not allowed to cross-examine English's experts regarding the findings of JPD's investigation and the JPD report. *Id.* at 490-92, 494.

¶20.  The jury returned a $3 million verdict against Rebelwood. *Id.* at 486.  Rebelwood appealed.  On appeal, this Court addressed two issues related to the JPD report: (1) whether the report was admissible as substantive evidence, and (2) whether Rebelwood was entitled to use the report to cross-examine English's experts. *Id.* at 491-94.

¶21.  Regarding the first issue, this Court noted that "[e]ven though police reports, if offered in evidence to prove the truth of the matter asserted are hearsay . . . , they may be admissible

8

under the hearsay exception in [Mississippi Rule of Evidence] 803(8)." *Id.* at 491. We explained that a "conclusion in a police report may be admitted if it is 'based on a factual investigation[,] and [it] satisfies the Rule's trustworthiness requirement.'" *Id.* at 493 (second alteration in original) (quoting *Fleming v. Floyd*, 969 So. 2d 881, 885 (Miss. Ct. App. 2006), *rev'd on other grounds*, 969 So. 2d 868 (Miss. 2007)). This Court discussed four factors relevant to a police report's trustworthiness: "(1) the timeliness of the investigation; (2) the investigator's skill or experience; (3) whether a hearing was held; and (4) possible bias when reports are prepared with a view to possible litigation." *Id.* at 493 (internal quotation marks omitted) (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 168 n.11, 109 S. Ct. 439, 102 L. Ed. 2d. 445 (1988)). As to the question of whether the police report should be admitted in evidence, this Court concluded that these factors supported the admission of the JPD report and that the trial court had abused its discretion by "failing to perform a trustworthiness analysis before excluding the police report in its entirety . . . ." *Id.* at 493-94.

¶22. Regarding the second issue, whether Rebelwood was entitled to use the report to cross-examine English's experts, this Court held that the trial court abused its discretion by prohibiting Rebelwood from using the JPD report to cross-examine English's experts "when each liability expert testified that he had relied at least in part on the excluded document to formulate his opinion." *Id.* at 494.

¶23. "English's experts testified that they had relied on portions of the police reports to formulate their opinions, but Rebelwood was prohibited from effective cross-examination

9

designed to impeach their opinion testimony by revealing the contents of the reports they allegedly had relied upon." *Id.* at 491. As a result, witnesses such as Deputy Chief Lewis were allowed "to testify with impunity and without fear of exposure" that there was "no documentation" or "written statements . . . to say that [the shooting] did not happen [at Rebelwood]." *Id.* at 492 (third alteration in original) (internal quotation mark omitted). This Court noted that "[t]he trial court should have known that Lewis's statement was untrue" because "repeated references and statements to the contrary exist[ed] throughout the investigative reports." *Id.* Thus, the Court concluded that the trial court's ruling "left [the jury] with a false impression" about the JPD reports, "violated the purpose and construction" of the rules of evidence (i.e., to determine the truth), and denied Rebelwood "a fundamentally fair opportunity to cross-examine" English's witnesses. *Id.* Hence, this Court determined that Rebelwood was entitled to use the report to cross-examine English's experts when the failure to do so would impede Rebelwood's right to a fair trial and the determination of the truth.

### C. *Application of **Rebelwood** Here*

¶24. Here, the trial court found that under ***Rebelwood***, defense counsel could cross-examine Hannah regarding the UCR, including the narrative section prepared by Trooper Lucas, because Hannah had relied at least in part on the document to formulate his opinion. Defense counsel read directly from the UCR's narrative section, which reflected Trooper Lucas's opinions and conclusions regarding the vehicles' path and the cause of the accident,

10

and then he asked Hannah if Hannah agreed or disagreed.  For example:

> Defense Counsel:    Okay.  Continuing on to the "Narrative" portion.  "Ms. Murray crossed the center line and struck the rear wheels of the left side."  Do you agree with that or do you dis[agree?]
>
> . . . .
>
> Defense Counsel:    Okay.  The next part says, "Ms. Murray continued north and struck Mr. Parker at the left trailer wheel."  Do you agree or disagree with that finding from Trooper Lucas?

¶25.    After Hannah's testimony, Trooper Lucas was called as a witness.[5]  Trooper Lucas testified regarding his opinion of where and how the accident occurred.[6]  He concluded that the collision had occurred in the southbound lane and that Murray's vehicle had crossed the center line and struck Parker.  The trial court admitted the UCR during Trooper Lucas's testimony after concluding that it satisfied the trustworthiness requirement of Rule 803(8).

¶26.    Thus, the trial court, relying on *Rebelwood*, found that the UCR was admissible and that defense counsel could cross-examine Hannah with the UCR, including its narrative and diagram.  But we find that this case is distinguishable from *Rebelwood*.

¶27.    As the Court of Appeals noted,

> This case raises a different issue than *Rebelwood*. The JPD reports in *Rebelwood* compiled evidence gathered by the investigating officers and

---

[5] Murray rested her case-in-chief after Hannah's testimony.  Gray and Parker then called one witness, Trooper Lucas, in their defense.

[6] Trooper Lucas was neither offered nor accepted as an expert in accident reconstruction.  Nevertheless, Trooper Lucas testified without objection regarding his opinion as to the cause of the accident.

11

reached certain factual conclusions. But the JPD reports did not offer expert opinions. The UCR in this case, in contrast, includes not only evidence based on Trooper Lucas's direct observations of the crash scene but also a narrative and diagram that essentially reconstruct the subject crash based on Lucas's opinions as to how that crash occurred. This is a material difference between this case and *Rebelwood*.

. . . .

. . . [A]lthough Trooper Lucas had substantial experience investigating accidents and preparing accident reports, there was no evidence that he was qualified as an expert in accident reconstruction. Indeed . . . , the defense stated that they would not attempt to qualify him as an expert in that field.

*Murray*, 2020 WL 4436712, at *7, *9.

¶28. The Court of Appeals properly concluded that "[b]ecause Trooper Lucas was not qualified as an expert in accident reconstruction, his opinions on the paths of the subject vehicles and fault did not satisfy Rule 803(8)'s trustworthiness requirement. Accordingly, the trial court abused its discretion by admitting the UCR's narrative and diagram." *Id.* at *9 (citing *Mitchell v. Barnes*, 96 So. 3d 771, 780 (Miss. Ct. App. 2012)).

¶29. Notably, Gray and Parker do not contest this issue. Indeed, they do not argue on certiorari that the UCR's narrative and diagram were properly admitted.[7] Instead, they argue that the UCR was properly used in its entirety to cross-examine Hannah "in order to clarify to the jury that conflicting evidence existed within the UCR." We disagree and find that the trial court erred by admitting the UCR and allowing defense counsel to use the UCR's

---

[7] In fact, in a pretrial hearing, defense counsel stated, "Candidly, Judge, there is a narrative component of the [UCR] where Trooper Lucas essentially states his opinion as to what happened and does a little diagram. I believe the law is clear until you qualify him as an expert in accident investigation, that narrative portion can't come in."

12

narrative and diagram to cross-examine Hannah.

¶30.    Relying on *Rebelwood*, Gray and Parker assert that "[b]ecause the UCR is the only evidence that . . . Hannah relied upon when forming his expert opinion," it is only "fair" that they be allowed "to cross-examine [Hannah] with th[e] entire UCR[.]" But the record clearly reflects that the UCR was not the only evidence Hannah relied on in formulating his opinion. Hannah testified that his opinion was based on the UCR as well as testimony from the parties, his review of the accident scene, and his review of the vehicles. Hannah explained that he relied on the UCR in that it "gave [him] a location, a date, a time, and . . . photographs . . . that [he] used then and now." In other words, Hannah relied on the UCR for *factual* information. Yet defense counsel was allowed to use the UCR to cross-examine Hannah regarding Trooper Lucas's *opinions* as noted in the narrative and diagram. As the Court of Appeals properly stated, "[t]here is no general right to cross-examine an opposing party's expert about the inadmissible opinions of a non-expert." *Murray*, 2020 WL 4436712, at \*10. Simply because Hannah relied in part on the UCR does not "open the door to cross-examination about otherwise inadmissible parts of the UCR." *Id.*

¶31.    Gray and Parker further assert that Hannah's testimony misled the jury. They claim that "[b]y extolling the investigative efforts of Trooper Lucas, [Hannah] gave the impression to the jury that the UCR, along with Trooper Lucas's investigations, supported Hannah's expert opinion that . . . Parker caused this accident" when, "[i]n reality, the UCR and [Trooper] Lucas's findings did not support his opinion." But we agree with the Court of

13

Appeals:

> [Unlike in **Rebelwood**,] Hannah's testimony did not mislead the jury or give a false impression about the UCR. Nor did Hannah . . . make any factual claims that the UCR would have shown to be false. Nor did Hannah state or imply that Trooper Lucas agreed with his opinions about how the wreck occurred or which driver was at fault.

*Id.*

¶32. Moreover, unlike in **Rebelwood**, Hannah's testimony did not deny Gray and Parker "a fundamentally fair opportunity to cross-examine" Hannah. **Rebelwood**, 48 So. 3d at 492. Indeed, Gray and Parker "could have conducted a full and fair cross-examination of Hannah without injecting Trooper Lucas's opinions into the case." **Murray**, 2020 WL 4436712, at *10. In fact, Trooper Lucas's opinions mirrored Parker's testimony—that Murray had crossed the center line into Parker's lane of traffic. And Hannah testified that he relied on Parker's testimony in formulating his opinions. Gray and Parker had the opportunity and did in fact cross-examine Hannah regarding Parker's version of the accident.

¶33. We agree with the Court of Appeals and find that the trial court abused its discretion "by allowing cross-examination of Hannah concerning Trooper Lucas's opinions, as reflected in the narrative and diagram sections of the UCR." *Id.* Further, we reiterate that a trial court should be very careful in the admission of a report of law enforcement. Such reports are not admissible as a matter of right under Rule 803(6) or (8). Instead, the trial court must examine the information sought to be used from the accident report and consider the admission of such evidence based on the Mississippi Rules of Evidence.

II. *Whether the trial court abused its discretion by allowing defense counsel to cross-examine Hannah about an adverse **Daubert** ruling in another case and the evidence in two other cases in which Hannah testified.*

¶34. During cross-examination of Hannah, defense counsel also attempted to examine Hannah using several judicial opinions from cases in which Hannah had previously been excluded or testified as an expert witness. These cases were identified as **Burnham v. Austin**, No. 3:14-cv-435-WHB-RHW (S.D. Miss. Sept. 11, 2015), **Mitchell v. Barnes**, 96 So. 3d 771 (Miss. Ct. App. 2012), and **Davis v. Ford Motor Co.**, No. Civ. A 302CV271LN, 2006 WL 83500 (S.D. Miss. Jan. 11, 2006).

¶35. Murray first claims it was error to cross-examine Hannah about other cases in which he had been excluded or testified as an expert and to "read aloud opinions from various courts." Murray next argues that it was error when Hannah was asked whether he was aware that the court, in **Burnham**,[8] had "struck your opinions as not being sufficiently tied to the facts or evidence in the record so as to be admissible."

¶36. Gray and Parker admit that counsel attempted to cross-examine Hannah with facts

---

[8] In **Burnham**, as in this case, Hannah testified that a gouge mark was found at the accident scene that would indicate the area of impact of the collision. **Burnham**, No. 3:14-cv-435-WHB-RHW at *5. Based on calculations made using the gouge mark as the point of impact, Hannah opined that the defendant was at fault. **Id.** at *8. But the district court noted that "[t]here [wa]s no evidence . . . that the gouge mark used by Hannah when making his calculations and/or formulating his opinions was actually created during, or was in any way connected to, the subject collision." **Id.** at *9. The district court found that "Hannah's calculations and opinions ha[d] not been shown to be sufficiently tied to the facts or evidence in the record so as to be admissible under **Daubert**" and therefore excluded Hannah as an expert witness in that case. **Id.** at *12-13.

from the **Burnham**, **Mitchell**, and **Davis**. They argue that counsel did not read aloud court opinions to the jury. Rather, they claim that counsel tried to use the facts from these cases in an attempt to refresh the witness's memory to cross-examine Hannah on the credibility of his opinions.

¶37.    The Court of Appeals considered whether it was proper to cross-examine an expert about judicial decisions in other cases.  The court found that the trial court abused its discretion by allowing the cross-examination because "it had no relevance to the present case and yet created a risk of unfair prejudice, misleading the jury, and confusing the issues." **Murray**, 2020 WL 4436712, at *12 (citing MRE 401-403).

¶38.    We firmly recognize that a trial is a search for the truth.  And cross-examination is "beyond any doubt the greatest legal engine ever invented for the discovery of the truth." 3 Wigmore, *Evidence* § 1367 (2d ed. 1923); *see also* **California v. Green**, 399 U.S. 149, 158, 90 S. Ct. 1930, 1935, 26 L. Ed. 2d 489 (1970)).  An expert witness is subject to "wide-open cross-examination" on "any matter that is relevant. . . ." **Redding v. Miss. Transp. Comm'n**, 169 So. 3d 958, 964 (Miss. Ct. App. 2014) (internal quotation mark omitted) (quoting **Anthony v. State**, 108 So. 3d 394, 397 (Miss. 2013)). Thus, we find it is entirely proper to impeach an expert witness by showing that he has offered inconsistent opinions in prior litigation. *See* 1 *McCormick on Evidence* § 35 (8th ed. 2020) ("If a witness, such as an expert, testifies in terms of opinion, all courts permit impeachment by showing the witness's previous expression of an inconsistent opinion." (citing **McGrath v. Fash**, 244 Mass. 327,

16

139 N.E. 303 (1923))), Westlaw (database updated Jan. 2020). Likewise, it is also proper to impeach a witness by challenging the reliability of his opinions or by arguing that his opinions were not based on sufficient facts or data or were not the product of reliable principles and methods and that he failed to reliably apply the principles and methods to the facts of this case. MRE 702(b)-(d). Here, the impeachment apparently sought to prove that Hannah had a pattern of finding gouge marks and failing to photograph or document the gouge marks' exact location so that the reliability of the opinion could be considered, applied, or challenged by other experts in their opinions.

¶39. The judge had made it clear that his close evidentiary call in allowing Hannah to testify about the supposed gouge marks would be met and handled by vigorous cross-examination.[9] And this approach is exactly what the Supreme Court endorsed in *Daubert*. *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of

---

[9] It is indeed questionable whether Hannah should have been permitted to testify about his "gouge mark" reconstruction theory in the first place. Hannah freely admitted he was unsure whether the supposed gouge mark he based his analysis on was actually caused by the subject collision. Not only did he admit the particular gouge mark could have very well existed before the accident, he never even photographed this supposed mark. And the Highway Patrolman did not see any gouge mark. These red flags prompted Parker's attempt to exclude Hannah's testimony. When attempting to exclude Hannah's testimony, Parker's attorney pointed the trial judge to *Burnham*, a case in which Judge Barbour—acting as *Daubert* gatekeeper—excluded Hannah from testifying. *Burnham*, No. 3:14-cv-435-WHB-RHW, at *12-13. In that case, Judge Barbour excluded Hannah because there was "no evidence that the gouge mark on which Hannah relies has any connection to the collision." *Id.* at *12. While this is the same factual scenario Hannah faced here, the trial judge allowed Hannah to testify over Parker's objection. And on appeal, Parker's counsel did not raise the judge's admission of Hannah's testimony as error.

17

attacking shaky but admissible evidence."). Instead of excluding "shaky but admissible" expert testimony, the trial court could certainly opt for aggressive and sweeping cross-examination to expose weaknesses in expert opinions. *Id.* So it was within the judge's broad discretion to deem these inquiries relevant.

¶40. What the judge did was permit Gray and Parker to question Hannah using judicial opinions about Hannah's previous *Daubert* exclusions and testimony—particularly the *Burnham* case. That said, contrary to the Court of Appeals' framing of the issue, *Burnham*, *Mitchell*, and *Davis* were not used simply to impeach Hannah under Mississippi Rule of Evidence 611. Rather, according to Gray and Parker's counsel's own words at trial, he was attempting to use these judicial opinions under Mississippi Rule of Evidence 612 to refresh Hannah's memory or recollection of events.[10] And while it is certainly fine to use

---

[10] The following is the relevant portion of the cross-examination of Hannah:

Q.    Mr. Hannah, I want to hand you a case where you served as an expert witness. This is September 2015. Do you remember this case? This was the Burnham versus Jodie Everett Austin and Big Creek Farms Hauling, LLC.

A.    Yes. Bessie Grantham.

Q.    Right. Right. And you recall providing expert testimony in that case?

A.    Yes.

Q.    Opinions like in this case?

A.    Yes. At a deposition.

Q.    All right. And the facts of this case are somewhat similar to this case in

18

that it involved an automobile and a tractor-trailer collision on Highway 49?

A.  It involved an automobile and a tractor-trailer, but the case is nowhere near similar. It was at an intersection. There was red and yellow lights involved. The car was turning left in front of a vehicle.

Q.  Fair enough. I was just making the corollary that in that case, you were testifying for the plaintiff, who was driving the car?

A.  Yes.

Q.  The defendant was driving a tractor-trailer?

A.  That is correct.

Q.  Okay. All right. And *if you flip to page 2*, because I -- you know, I don't expect you to have total recall of this case and every case that you have ever testified in. But in this case, the accident was actually witnessed by an eyewitness; is that --

A.  There was -- there was numerous, yes.

Q.  *So at the bottom of page 2, first paragraph, "The collision was witnessed by Paul Calcote." Do you see that?*

A.  *That's correct.*

Q.  *Okay. And his testimony was that the plaintiff caused the wreck, not the defendant, right?*

A.  *That's correct. That's correct.*

Q.  And he saw it happen. You didn't. Yet, it was still your opinion that the defendant caused the wreck?

A.  My opinion is based on the facts. This person saw what they saw and they gave testimony about the traffic light changing from yellow to green -- from green to yellow.

19

. . . .

Q. Okay. All right. Back to the Burnham case that we were just talking about before we got back into your report.

A. Yes.

Q. If you would, *please go to page 5.*

A. *Okay.*

Q. *And in the middle of the page, that paragraph will start, "There was a gouge mark found." Do you see that?*

A. *I do.*

Q. *Okay. "There was a gouge mark found in the easternmost portion of where the northern-bound left lane of Highway 49 would cross the eastbound lane of Wilson Drive. This would indicate the area of impact." That's the same term that you used with the gouge mark in our case?*

A. "Area of impact." I use it in all my cases. Most reconstructionists do.

Q. Okay. *If you would, please flip over to page 9. Okay. And the Court noted, if you look at that first full paragraph, it's talking about the gouge mark you say that indicated the area of impact.*

A. Yes.

Q. "There is no evidence" --

[Murray counsel] My objection is, it's improper for him to read a Supreme Court opinion, which is what he, I think, is getting ready to do, and ask him about the law, what the Supreme Court said about his testimony in a prior case.

. . . .

[Gray/Parker counsel] I have never had an expert witness that has as

20

many opinions striking his testimony as of Mr. Hannah. . . .

THE COURT:    I think whether or not another court has disallowed his opinions or something, you know, that may be relevant to whether I admit his opinion.

Q.    Mr. Hannah, in this Burnham case . . . Do you have any knowledge whether the Court struck your opinions as not being sufficiently tied to the facts or evidence in the record so as to be admissible?

A.    I do not. What I do know is, I gave a deposition and I knew nothing else about the case, as I do in a lot of my cases.

Q.    Do you want to know?

[Objection sustained]

. . . .

Q.    Mr. Hannah, I want to ask you about another case where you were an expert witness. This is the Althea Davis versus Ford Motor Company case. Do you remember this one?

A.    I do.

Q.    Okay. And your opinion in this case was that the vehicle was starting to roll over before leaving the roadway. Is that it in a nutshell?

A.    I've worked probably 500 of these Ford rollovers with the Firestone tires. I don't really remember if it began on the shoulder or the roadway on this one.

Q.    All right. *It indicates here that on page 3, the roll initiated --*

[Murray's counsel] I would object to him reading a case to the jury, Your Honor.

[Gray/Parker's counsel]    Judge, I'm trying to refresh his memory on where

21

this accident occurred in this case. Not an opinion. It's not his testimony. I'm trying to refresh his memory.

[Murray's counsel] Why don't you -- I would ask that he show the witness.

COURT:     Show it to him and ask him if it refreshes his memory.

Q.     Mr. Hannah, page 3.

A.     I'm on page 3.

Q.     Okay. Do you see the sort of indented paragraph in the bottom right corner?

A.     Yes.

Q.     Where it's starting to talk about -- do you see your name, "Hannah"?

A.     I do.

Q.     Where does it say that the vehicle was starting to go airborne?

A.     Right edge of the pavement.

Q.     Okay. So as it was leaving the pavement. Is that fair?

A.     If you give me a moment.

Q.     Sure.

A.     (Document review.) In that particular case, I believe the evidence showed me that three of them were on the ground and one was faint.

Q.     That was your testimony. Right.

A.     Yes. That it was attempting to go airborne.

Q.     And, again, in that case, there were two eyewitnesses that saw the

accident, testified that the vehicle stayed on all four tires as it exited the roadway and for quite a distance before it rolled over?

A.     I don't remember two eyewitnesses saying that.

Q.     How many do you remember?

A.     I don't remember any eyewitness saying it. I remember some people after saying that they saw some marks or something like that from a helicopter.

Q.     Barbie Bassett?

A.     From a helicopter up in the air.

Q.     And Barbie Bassett was in the helicopter. Do you remember that?

A.     Yes, I do.

Q.     And Barbie Bassett was in Skycopter 3?

. . . .

Q.     There was video evidence shot by Barbie Bassett in Skycopter 3 that showed tire marks, two lanes of tire marks, leaving the roadway for some distance before the car rolled over. Do you remember that?

A.     In the area that the video was shot, they drew – drew lines in an area where tire marks should have been, but the photograph clearly showed there weren't any marks there.

Q.     You're positive about that? Let me see if I can refresh your memory.

A.     Okay.

Q.     Just one minute. Okay. If you'd go to the last page.

A.     Yes.

23

. . . .

Q.     Right there is what I want you to take a look at (indicating), and if you need to read before and after –

A.     What's the number at the bottom of that page?

Q.     It's 8, the last --

A.     Oh, okay.

Q.     I'm sorry, it's the next to last page. I apologize. It's right here (indicating). It starts, "The tracks."

A.     I see what that says.

Q.     Okay. And you were wrong when you spoke just a minute ago. Somebody didn't come in with a pen or whatever and draw in the tire marks. The tire marks were clearly visible, correct?

A.     I was telling how the trial and what the exhibits showed in the trial.

Q.     Okay. *But what you read is not consistent with what you just said?*

[Murray's counsel]  Your Honor, at this point, I'm going to object. Using cases to cross-examine a witness is not proper, and that's all this counsel opposite has done.

COURT     – the way to do it is to ask him if his memory has been refreshed.

Q.     Has your memory been refreshed about the visibility of the tire marks?

A.     Again, as I just stated

COURT:    Answer "yes" or "no," and then you can explain it, if you need to.

A.     Well, the answer would be no. . . . Based on what you just said, the answer would be no.

Q.     Okay. So your memory has not been refreshed as to whether the

24

judicial opinions to refresh an expert's recollection, it was the manner in which the judge permitted the refreshing that causes our concern and in which we find error.

¶41.   Rule 612 allows counsel to use a writing to refresh a witness's memory.  MRE 612. The advisory committee note states:

> The purpose of Rule 612 is to stimulate memory in order to ascertain credible evidence.
>
> If the witness uses a writing, recording or object (e.g., a photograph) while testifying, the adversary has the right to see such writing, recording or object, to cross-examine on the basis of these items, and to have the relevant portions introduced into evidence. If, on the other hand, the witness uses such items to refresh his memory before testifying, then it is within the trial court's discretion to allow the adversary to see them.

MRE 612 advisory comm. n.

¶42.   Though it is not everyday an attorney attempts to refresh the recollection of a witness

---

photographs clearly reveal two tire marks leaving

[Murray's counsel]  I would object to him reading caselaw, Your Honor. I would -- I would object to him using cases --

COURT:     Yeah, you're testifying now,

Q.     Your memory was not refreshed on what you read?

A.     You didn't ask that.

Q.     Was your memory refreshed by what you read?

A.     Again, that was not what I remember. Okay. So, no.

. . . .

(Emphasis added.)

he or she is cross-examining, our evidentiary rules do not preclude it. Rule 612(a) allows the questioning attorney to use any document or other item to try to jog or refresh the witness's memory or recollection. Counsel may offer the witness his written notes, a recording of an interview, a newspaper article, an affidavit, a photograph, or even a social media post. The rule does not limit what the witness may use to jog his memory. Any document may be used.[11] Thus, under Rule 612, a judicial opinion from another case in which Hannah was excluded or had previously testified may certainly be used to refresh his memory or recollection.

¶43. However, Rule 612(a) also requires that the witness must testify that the document does in fact refresh his memory or recollection of the events that are the subject of his or her testimony.

¶44. Thus, while Gray and Parker's counsel were within the rule to provide a judicial opinion to Hannah, counsel could only ask Hannah to review the opinion and answer whether this opinion *refreshed* his memory or recollection. If Hannah answered that question yes, counsel could continue the line of questioning without reading from the document. If Hannah answered no—as far as refreshing recollection goes—counsel would have to simply move on to another line of questioning. What counsel could not do under Rule 612 is what counsel did in fact do—ask Hannah to read from the judicial opinions. We ultimately reach

---

[11] Rule 612(b) provides that the opposing counsel is "entitled to have the writing, recording, or object produced at the hearing, to inspect it, to cross-examine the witness about it, and to introduce in evidence any portion that relates to the witness's testimony." MRE 612(b).

26

the same conclusion as the Court of Appeals—albeit for a slightly different reason—that the manner in which this questioning was permitted was error.

III. *Whether the weight of the evidence is sufficient to outweigh any harm done by the trial court's errors.*

¶45. "For a case to be reversed based on the admission or exclusion of evidence, a party must be actually prejudiced, harmed, or have a substantial right adversely affected." ***Ill. Cent. R.R. Co. v. Brent***, 133 So. 3d 760, 779 (Miss. 2013) (citing ***Bower v. Bower***, 758 So. 2d 405, 413 (Miss. 2000)). Under the harmless-error doctrine, "if 'the weight of the evidence . . . is sufficient to outweigh [any] harm done by allowing admission of the evidence' then reversal is not warranted." ***Id.*** (second alteration in original) (quoting ***Bower***, 758 So. 2d at 413). But "multiple errors, which alone may not require reversal, may constitute reversible error if the cumulative effect of the errors resulted in an unfair trial." ***Lacoste v. Lacoste***, 197 So. 3d 897, 913 (Miss. Ct. App. 2016) (citing ***Blake v. Clein***, 903 So. 2d 710, 732 (Miss. 2005)).

¶46. The Court of Appeals found "Murray [wa]s entitled to a new trial based on the cumulative effect of errors during the first trial." ***Murray***, 2020 WL 4436712, at *12. But, Gray and Parker argue, "[t]he weight of the evidence at trial was sufficient to outweigh any harm done by the trial court's alleged errors." They contend that "[a]ny error was harmless because the trial court could have directed a verdict[12] based upon Hannah's opinions . . .

---

[12] Gray and Parker moved for a directed verdict after Murray's case-in-chief. They renewed their motion after the conclusion of all evidence. Both motions were denied.

27

that the accident occurred within . . . Parker's southbound lane of traffic."  We disagree.

¶47.    Hannah opined that based on a gouge mark he found at the scene, the collision or "area of impact" occurred in the southbound lane.  Gray and Parker assert that this is "overwhelming evidence that the accident occurred completely within Parker's southbound lane of traffic."  In other words, Gray and Parker assert there is overwhelming evidence that Murray crossed the center line and was at fault.  But Hannah testified that *both* Murray and Parker's vehicles crossed the center line.  And Murray testified that her vehicle was in her lane, the northbound lane, at the time of the collision.  Moreover, Hannah's opinions regarding the area of impact were based on a gouge mark that only he found and failed to photograph.  Trooper Lucas, who was on the scene shortly after the collision occurred, did not find or notice any gouge mark, and no gouge mark appeared in his photographs of the accident scene.

¶48.    Additionally, as the Court of Appeals noted,

> [I]t would be difficult, if not impossible, for us as an appellate court to say that the evidence was "overwhelming"—or to declare with confidence that the error was "harmless"—when we know that three of the twelve jurors, who listened to and observed the witnesses firsthand, found in favor of Murray despite the admission of hearsay[13] that improperly bolstered Parker's testimony.

---

[13] As previously noted, the Court of Appeals found that the trial court abused its discretion by admitting Trooper Lucas's hearsay testimony about what Parker told him at the accident scene, i.e., that Murray's "car [came] in on him and he swerved right to avoid the car." *Murray*, 2020 WL 4436712, at \*4 (internal quotation marks omitted).  Gray and Parker did not include this as an issue in their petition for writ of certiorari.  We, therefore, did not address it.

*Murray*, 2020 WL 4436712, at \*14.

¶49.    Considering the errors at trial, including the admission of the UCR and the improper cross-examination of Hannah, and given the divided jury verdict, "we cannot say that the evidence was so overwhelming that the cumulative effect of these errors can be dismissed as harmless." *Id.*

## CONCLUSION

¶50.    We find that Murray is entitled to a new trial. We therefore affirm the decision of the Court of Appeals, and we reverse the judgment of the Scott County Circuit Court and remand this matter to that court for a new trial.

¶51.    **THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED. THE JUDGMENT OF THE SCOTT COUNTY CIRCUIT COURT IS REVERSED AND REMANDED.**

    **RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR.**